EVAN W. LUMSDEN, JR., AND VERONA A. LUMSDEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lumsden v. Commissioner
Docket No. 12835-84.
United States Tax Court
T.C. Memo 1987-27; 1987 Tax Ct. Memo LEXIS 27; 52 T.C.M. (CCH) 1385; T.C.M. (RIA) 87027; January 12, 1987. Kevin P. O'Connell and Ted A. Johnson, for the petitioners. Randall E. Heath for the respondent. SWIFT
MEMORANDUM OPINION SWIFT, Judge: In a timely statutory notice of deficiency dated February 13, 1984, respondent determined deficiencies in petitioners' Federal income tax liabilities, as follows: Years
Deficiencies
1979
$9,185
1980
389
The sole issue for decision is the extent to which petitioner Evan W. Lumsden was at risk under section 465[1] with respect to the recourse liability of a partnership in which he invested as a limited partner. All of the facts have been stipulated, and this case was submitted under Rule 122, Tex Court Rules of Practice and Procedure. The pertinent facts will be summarized below. *28 Petitioners Evan W. Lumsden, Jr. and Verona A. Lumsden are husband and wife and resided in Milwaukee, Oregon, at the time the petition herein was filed. During the years in issue, Evan was a general partner in Meade Street Investors ("Meade"), a general partnership organized under the laws of Oregon.The purpose of the partnership was to invest in motion pictures. Evan owned an 18.52-percent interest in Meade, and nine other general partners owned varying individual interests totaling the remaining 81.48 percent. Profits and losses of Meade were allocated between its general partners on the basis of their respective partnership interests. Upon the formation of Meade, Evan contributed $10,000 in cash and the other general partners contributed a total of $44,000 in cash thereto. In December of 1979, Meade entered into a subscription agreement with ACG Motion Picture Investment Fund II ("ACG II"), a California limited partnership, under which Meade agreed to purchase a 1.080437-percent limited partnership interest in ACG II. ACG II was one of several limited partnerships organized by an individual named Michael Leone to acquire and distribute motion pictures. Michael Leone and *29 American Cinema Group, Inc., were the general partners of ACG II. A total of 91 limited partners invested in ACG II. The limited partnership agreement of ACG II provided that all rights and responsibilities of the general and limited partners of ACG II would be governed by California law. The purchase price agreed to by Meade for its interest in ACG II was $162,000, to be paid by a $54,000 cash downpayment and a deferred capital contribution reflected by a $108,000 recourse promissory note. Meade made the downpayment and gave to ACG II the $108,000 promissory note called for in the subscription agreement. The $108,000 promissory note bore simple interest at nine percent per annum, and payments of principal were due thereon in five equal annual installments of $21,600, plus interest, the first of which was due in 1981. As a general partner of Meade, Evan's share of the $54,000 cash downpayment paid by Meade to ACG II was $10,000, and his share of the $108,000 recourse promissory note Meade gave to ACG II under the subscription agreement was $20,000. Because of the general partnership interest Even owned in Meade and the limited partnership interest Meade owned in ACG II, the *30 effective share of the profits and losses of ACG II to which Evan was entitled was .2 percent and, for the purposes of the issue in this case, Evan may be treated as a limited partner of ACG II. With regard to each limited partners' recourse obligation to pay the cash downpayment and the deferred capital contributions due under the subscription agreement, the ACG II partnership agreement provided as follows: 6.1 Capital Contributions of Limited Partners. Each Limited Partner shall make a cash contribution to the capital of the Partnership equal to the product obtained by multiplying $150,000 by the number of Interests or fractions thereof purchased by such Limited Partner, which sums shall be payable pursuant to and contemporaneously with the execution by such person or entity of a subscription agreement (the "Subscription Agreement") evidencing the desire of such person or entity to purchase Interests and become a Limited Partner. Payment of the capital contribution shall be made as follows: $50,000, or a fraction or multiple thereof according to the number of Interests or fraction thereof purchased, by certified, cashier's or bank check upon execution and delivery of the Subscription *31 Agreement, together with the delivery of a promissory note for $100,000, or multiple or fraction thereof in accordance with the number of Interests or fractions purchased, in favor of the Partnership, bearing interest at 9% per annum, payable over 60 months in five equal annual installments. Also, with regard to the deferred capital contributions and the limited liability of the limited partners for the debt obligations of the partnership, the ACG II partnership agreement provided as follows: 6.3 Limited Liability. A Limited Partner shall not be bound by, or personally liable for, any expenses, liabilities or obligations of the Partnership, except as provided in the Act. No Limited Partner shall be required or obligated by the Partner to make further capital contributions of any kind whatsoever to the capital of the Partnership beyond those for which he is obligated pursuant to Section 6.1 hereof; * * * and 10.1 No Limited Partner shall be personally liable for any debts of the Partnership or any of the losses thereof, however, the amount committed by him to the capital of the Partnership and his interest in Partnership assets shall be subject to liability therefor. * * *32 * On or about April 23, 1980, ACG II obtained a $7,800,000 recourse loan from the London Branch of the First National Bank of Chicago. Simple interest accrued on the bank loan at a floating market rate. [2] The principal amount of the loan was payable in full on or before April 23, 1982. Interest payments were due quarterly. As security for the $7,800,000 loan, ACG II pledged to the First National Bank of Chicago substantially all of its assets, including the recourse promissory notes it had received from its limited partners reflecting their respective obligations to make the deferred capital contributions. The combined face amount of the promissory notes of the limited partners that ACG II pledged to the bank as collateral on the $7,800,000 bank loan totaled $10,046,300. Meade's $108,000 promissory note to ACG II was among those notes that were pledged as collateral on the bank loan. The loan agreement between ACG II and the bank specified that the recourse promissory notes of the limited *33 partners of ACG II (reflecting the limited partners' obligations to make deferred capital contributions) were to be physically transferred to the bank in order to protect the bank's security interest in the notes. The relevant language from the loan agreement provided as follows: (1) The Promissory Notes shall be deposited with the Bank or at such other place as shall be designated by the Bank and held, in either case, to the sole order of the Bank. Without in any way reducing, affecting or delegating from Charge hereby created in favour of the Bank, the parties acknowledge that the Bank shall in its absolute discretion and without reducing or affecting its other rights hereunder, be entitled to direct Limited Partners to make payment as they fall due under the Promissory Notes to [ACG II] and not to the Bank, if the Charge shall at the time of such payment be then valid and existing. In 1979, ACG II agreed to purchase from American Cinema Productions, Inc., a feature-length motion picture entitled "Charlie Chan and the Curse of the Dragon Queen." The purchase price for the film of $20,000,000 was to be paid by ACG II with an $8,300,000 cash downpayment and an $11,700,000 nonrecourse *34 promissory note bearing simple interest at 10 percent per annum. ACG II paid the $8,300,000 cash downpayment primarily out of the proceeds of the loan from the First National Bank of Chicago. On its Federal partnership return for its short taxable year beginning December 28, 1979, and ending December 31, 1979, ACG II reported a net operating loss in the amount of $14,428,439. On their joint 1979 Federal income tax return, petitioners reflected Evan's share of ACG II's net operating loss, namely $28,695 (18.52 percent of $154,943). On its Federal partnership return for 1980, ACG II reported a net operating loss in the amount of $317,288. On their joint 1980 Federal income tax return, petitioners reported Evan's share of ACG II's net operating loss, namely, $632 (18.52 percent of $3,411). Respondent upon audit determined that as of December 31, 1979, Evan's $20,000 share of the $108,000 recourse obligation of Meade to ACG II was not an amount with respect to which Evan was at risk within the meaning of section 465, and that Evan was at risk only to the extent of his $10,000 cash contribution to Meade. Because Evan made no cash payment to Meade in 1980, respondent determined *35 that Evan's amount at risk had not increased as of December 31, 1980. Accordingly, respondent disallowed $18,695 of the $28,695 loss claimed by Evan in 1979 and all of the $632 loss claimed by Evan in 1980 with respect to his interest in Meade. The parties herein agree that in all relevant respects, the facts in the instant case are identical to the facts set forth in our recent opinion in Melvin v. Commissioner, 88 T.C.     (Jan. 12, 1987).As in the instant case, the taxpayer in Melvin was a general partner in a partnership which purchased an interest in a limited partnership organized by Michael Leone. The purchase price for the limited partnership interest was paid by a cash downpayment and a recourse obligation to make defered capital contributions, evidenced by a recourse promissory note given to the limited partnership. The limited partnership pledged the recourse promissory notes of its limited partners to an unrelated third-party bank as collateral for a recourse loan to the partnership. Petitioners and respondent herein rely on the same arguments set forth and discussed thoroughly in Melvin. For the reasons stated in our opinion in Melvin, we find *36 that that petitioner Evan W. Lumsden was personally liable within the meaning of section 465 with respect to the debt obligation of ACG II to the bank, and he was at risk to the extent of his pro rate share of that obligation. Because the bank loan in the instant case was obtained in 1980 (and Meade's recourse promissory note was pledged to the bank in 1980), Evan's amount at risk for 1979 is limited to $10,000, representing his share of the cash downpayment Meade paid to ACG II in December of 1979. With respect to 1980, Evan's amount at risk is increased by his pro rata share of ACG II's debt obligation to the bank, namely $15,690 (.2 percent of $7,800,000). We so hold. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the years in dispute.↩
2. The interest rate on the bank loan was two percentage points over the rate paid by the First National Bank of Chicago to other banks on U.S. dollar deposits at its London Branch.↩